## ALEXANDER GRAY

*v.*

## THOMAS G. FOLWELL, SUSAN M. FOLWELL et al.

[Decided November 26th, 1898.   Filed June 10th, 1899.]

1. When shares of stock, although still standing in the name of the assignee on the company's books, appear to have been levied upon and sold by a judgment creditor of the assignor, and it is not shown that the purchaser has experienced any difficulty in obtaining a transfer, the title of the purchaser cannot be enforced or the assignee's lien be removed in an action by the judgment creditor to set aside the assignment as fraudulent.

· 2. Where conveyed real estate lies outside the state, and therefore not subject to the lien of a judgment obtained within the state, the courts thereof have no jurisdiction to set aside such conveyance as a fraud upon such creditor.

3. Where a transaction is capable of two constructions, one that comports with honesty and one with dishonesty, the former should be adopted by the courts.

Gray *v.* Folwell.

4. A husband owing $8,000, and having a suit pending against him on another claim, transferred to his wife property, part of which was worth about $4,000, the other part being labor claims against an insolvent railroad of doubtful value, receiving the next day, in consideration thereof, $6,000 from the wife's separate estate, which was used by him to pay his debts.   The wife testified that the money was furnished to buy the labor claims when in fact it was used to repay money borrowed to purchase such claims.   The wife supported the family out of her separate estate.   She subsequently turned over to her husband the amounts realized on the claims.   The husband afterwards paid the judgment rendered against him in the suit pending at the time of the . transfer.—*Held,* that the transfer was not fraudulent, although the wife may have had notice of the husband's intent to defeat the debt involved in the pending suit.

5. Where a conveyance is made for the purpose of defeating a single creditor, who is afterwards paid in full, and there were no other current creditors who might have been hindered or delayed, and there was no immediate intention to engage in a hazardous business and become indebted, a creditor who became so years afterwards cannot set up the old fraud in avoidance of the conveyance.

6. A husband conveyed directly to his wife all his rights in the estate of his father.   Shortly afterwards he made another conveyance to her, through a third person, of certain property received from his father's estate, covering all the property so received to which his title had been perfected.   He afterwards obtained title to certain land in another state, from such estate, but the former conveyance was not recorded in such state.—*Held,* that there was no conveyance of the property outside of the state.

7. A husband conveyed property to his wife, who put it in charge of an agent to collect the rents.   The husband occasionally managed to collect and retain some of the rents.   In letters from the wife to the agent, she instructed him not to allow the husband to collect rents, and stated: "Please do not pay the bills unless very small, for then it comes off of my income; otherwise, I can get [my husband] to pay; as the rents are security for debt, I should not pay expenses."—*Held,* that the conveyance, though absolute in form, was a mortgage, and a judgment creditor of the husband was entitled to redeem upon payment to the wife of the consideration which she gave, less the net rents and profits and cash which she may have received from the husband on account.

---

*Mr. John W. Wescott,* for the complainant.

*Mr. Allen B. Endicott,* for the defendants Folwell and wife, no one appearing for the other defendants.

PITNEY, V. C.

Alexander Gray, the complainant, is a judgment creditor of Thomas G. Folwell, the defendant, and files his bill against Thomas and his wife, Susan M. Folwell, and against the firm of Folwell Brothers & Company, composed of William H. Folwell and several others, asking the aid of this court in the enforcement of his judgment against certain property which he alleges Thomas G. Folwell has conveyed and assigned for the purpose of defrauding his creditors.

The judgment was entered in June, 1890, founded on an indebtedness which, according to the bill, arose on the 11th of April, 1890, but probably, as may be inferred from the evidence, four or five years before that date.

The bill attacks three transactions. First, a conveyance by the defendant Thomas to his wife, Susan, set out at length in the bill, dated January 20th, 1880, upwards of ten years before the recovery of the judgment. This conveyance was made d rectly by Thomas G. Folwell to his wife, Susan M. Folwell, in consideration, as stated, of certain sums of money advanced to him by his wife out of her separate estate, and purports to grant, bargain, sell, assign, transfer and set over to her all his right, title and interest in, to and out of the estate of his deceased father, Robert Folwell, the same being a life estate therein ; also two bonds issued by the city of Camden for $500 each, previously assigned by him as collateral security to the First National Bank of Camden ; and also certain labor claims due by the Philadelphia and Atlantic Railroad Company, certificates of which had been purchased by him to the amount, in face value, of about $13,000.

That conveyance was acknowledged by Folwell, and recorded in Camden county on the 22d of January, 1880.

No other conveyance of this property is set out in the bill, but it appeared in proof that on the 9th of February, 1880—twenty days later—the defendant Thomas conveyed to Mr. Harned, of Camden, by an ordinary deed of conveyance, certain lands in Camden, which are the lands intended to be conveyed

by the previous deed of January 20th, and Harned immediately conveyed the same to Mrs. Folwell.

The allegation is that the first-mentioned deed was made for the purpose of defrauding a certain creditor, to wit, a Methodist church in Camden, which was then suing Folwell in the court of chancery and subsequently obtained a decree against him for some $5,000.

The next matter attacked is an alleged assignment by Thomas G. Folwell to William H. Folwell, of the firm of Folwell Brothers & Company, of four shares of the Second National Bank of Atlantic City, four shares of the Atlantic City Safe Deposit Company, fourteen shares of the Electric Light Company of Atlantic City, together with a lot of unspecified judgment notes, mortgages, book accounts, number and amount and value of which are unknown. The allegation is that such assignments were made without consideration either by William H. Folwell or the firm of Folwell Brothers & Company.

The fact in regard to that matter is that about the 1st of January, 1890, Mr. Folwell was the owner of the shares of stock just mentioned, and had pledged them to a bank in Camden to secure the payment of two promissory notes of $300 each, and the bank held the certificates. He also, as he swears, owed the firm of Folwell Brothers & Company the sum of $400 for borrowed money, in order to secure which he made an assignment to them of the shares of stock so held by the Camden bank, subject, of course, to the prior lien of that bank. Subsequently Mrs. Folwell sent to Folwell Brothers & Company her check for $600 to pay the Camden loan; and they appear to have paid it, but, as far as appears in this cause, still hold the certificates of stock.

It further appears by a paper handed up after the hearing by the counsel of complainant, and not marked as an exhibit, that these shares of stock, while still standing on the books of the company in the name of Folwell, were levied upon by virtue of an execution issued upon the complainant's judgment and sold, and purchased by Mr. Wescott and a bill of sale given therefor by the sheriff to him, and that a bill of interpleader was filed by

29

the bank against Folwell, Folwell Brothers & Company and Wescott, to settle the title to the shares of bank stock, with the result that the title was declared to be in Wescott. No proof was offered as to the other shares of stock, or as to any difficulty Mr. Wescott has experienced in obtaining a transfer of those. Clearly, the bill is not framed with the view of enforcing Mr. Wescott's title thereto, or to redeem them from any lien that Folwell Brothers & Company or Mrs. Folwell may have upon them.

The next matter attacked is an assignment alleged to have been made at, or shortly after, the date of the judgment by Thomas G. Folwell to the defendant William H. Folwell of all his right, title and interest that he then had in and to what is known as the " Bingham estate," without further description, and the charge is that William H. Folwell holds that property in trust for the judgment debtor.

The Bingham estate appears by the proofs to be the interest which Thomas G. Folwell received under the will of his father, Robert Folwell, or else as his heir-at-law, in a piece of land in the State of Pennsylvania, and the allegation is that the conveyance was made without consideration.

With regard to this conveyance, I think that the complainant fails on two grounds. In the first place, the estate lies in the State of Pennsylvania, and is of course not subject to the lien of complainant's judgment, and it is quite beyond the power of this court to make any decree which will subject it to such lien, or by any decree apply it to the payment of the judgment. *Service* v. *Nelson, 1 McCart. 101.* In the second place, the proof is that the land was already subject to a mortgage—how much does not appear—and that it was conveyed by Thomas G. Folwell to his brother William in payment of two notes of $5,000 each which Thomas owed the firm of Folwell Brothers & Company, of which William H. Folwell was the senior partner. The conveyance was not put in evidence and no proof was made of any fraud whatever. The only evidence given was that of Thomas G. Folwell, who swore to the foregoing facts.

But there is another difficulty in making any decree in this

cause affecting any of the rights of Folwell Brothers & Company. The subpœna against them was returned "not found," and an order of publication was taken against them, but it does not appear to have been published. Subsequently, Mr. Ingersoll, a solicitor of Atlantic City, filed a joint answer for all the defendants, and the clerk filed among the papers an appearance by Ingersoll for these defendants. It afterward appeared that Mr. Ingersoll was not employed by Folwell Brothers & Company, but was employed, if at all, by the defendant Thomas G. Folwell without their authority, and that they have at all times repudiated his authority to appear for them, and that he has been discharged also by the defendants Thomas and wife, who appeared further on and at the hearing by Mr. Endicott.

Under these circumstances it is doubtful at least, even if a case were made against Folwell Brothers & Company, whether it would be safe to pronounce a decree against them without bringing them into court by further process.

With regard to the conveyance made in 1880 by Folwell to his wife, the circumstances are these: Mr. Folwell was, in his youth, a dry-goods merchant, in Philadelphia, and carried on such business up to the year 1872, when he was about thirty-four years old. At that time he was stricken with paralysis, and has been a confirmed paralytic ever since, and has not engaged in any regular business. His wife, the defendant Susan, had a large separate estate of her own, which she received partly from her father, partly from her mother and partly from two aunts, so that she had a considerable income; just how much does not appear. They lived for many years, and still live, in Atlantic City. The defendant Thomas attempted to make some money by buying commercial paper and other pecuniary claims, many, apparently, of doubtful value. Among other operations of that kind, he purchased a large number of certificates of indebtedness to laborers, due by what was then called the Narrow Gauge Railroad Company, which was built some time prior to 1880, which company was embarrassed and finally became insolvent. Many of the certificates were held by shopkeepers and others who had taken them from the laborers.

Gray *v.* Folwell.

As far as I can gather from the evidence, the face of the claims bought by him was about $13,000, and they cost him about $8,000. In order to obtain the money to purchase these and other commercial paper, he borrowed money of a bank in Camden upon his own paper, endorsed by some good endorser, and also placed some collateral with the notes in the bank. In 1880 he owed $6,000 or $8,000, partly for money borrowed from the banks and partly to merchants along the line of the railroad, from whom he had bought these certificates of indebtedness called "labor claims." He possessed at that time a life estate in some fourteen houses and lots in Camden, two bonds of the city of Camden, of $500 each, which were pledged as collateral to one of the banks for notes discounted, and these labor claims, which had cost him about $8,000. At that time, as I understand, the existence of his interest in what was called the Bingham estate was unknown, or at least its value was unknown. He swears that it was not known at the time of the death of his father, but was discovered afterwards.

To secure this indebtedness he made the conveyance of January 20th, 1880, above set forth. On February 9th, 1880, and before any money was advanced by his wife, he made the conveyance of the Camden lots, through Mr. Harned, to his wife, also above set forth. The necessity for this conveyance was apparent to any lawyer or good business man. His wife, on that 9th day of February, or within one or two days thereafter, drew eight checks, aggregating in amount $6,223.11, on the Guarantee Trust and Safe Deposit Company of Philadelphia, which was her trustee, which checks were produced and shown satisfactorily by the evidence to have been applied to the payment of her husband's indebtedness. She subsequently, and within two years, drew many other checks to her husband's order, amounting to upwards of $5,000, making altogether $11,400 actually paid by her.

The source of these large sums paid by Mrs. Folwell in February, 1880, was the sale by her for $7,000 to the Reading railroad of a house and lot in Philadelphia, which was consummated on or about January 1st, 1880. Within a couple of years after-

wards she received, as proceeds of the collection of the labor certificates, about $5,500, and this payment probably constituted the fund from which she made the additional payments to her husband, going to make up the total of $11,400. She was all the while, as she swears, and in that statement is uncontradicted, supporting the family from her own private income.

The net rental of the houses in Camden varies from $35 to $50 a month, or say from $400 to $600 a year, after paying taxes, insurance and repairs. If her husband had been a man in ordinary health at that time, being forty-two years old, an income of $600 a year would have been worth, in round figures, $3,400 on a six per cent. basis, and $3,600 on a five per cent. basis. An income of $500 would have been worth $3,000 on a five per cent. basis, and a little over $2,800 on a six per cent. basis. Mrs. Folwell swears that her husband's life estate in the houses was estimated at that time to be worth about $3,300. The bonds were worth $1,000, making a little over $4,000 as the total value of the property which she received, independent of the labor claims, which latter, as we have seen, netted $5,500. The deficiency in the amount collected on the labor claims was due to the insolvency of the railroad. The total value of the estate and property conveyed to her amounted to between $9,500 and $10,000.

No legal proof was made of any decree ever having been obtained against Mr. Folwell in the suit of the Methodist church then pending against him, but he admitted on the stand that there was such a decree, and declared that he paid it as soon as possible, by money which he received from the Bingham estate. His statement in that regard stands uncontradicted, and it seems that he first received from that estate a sum of money in cash, and afterwards obtained the title to the land in question in Pennsylvania.

Under these circumstances it would seem that the attempt to declare the conveyance in question void as against future creditors has but little foundation in fact or law.

There was a sort of assumption by counsel for complainant throughout the case that Mr. Folwell was unworthy of belief,

and by way of contradicting his evidence, his examination, under a bill filed against him alone, under the eighty-eighth section of the Chancery Practice act, was offered in evidence for that purpose. I have carefully read his deposition so taken, and do not find any serious contradiction between that examination and his evidence given on this hearing. Other depositions were taken under the discovery suit, but of course were not received in evidence, and his deposition was received simply for the purpose of contradicting him.

At this point I will notice the only attempt to contradict Mrs. Folwell, namely, that she stated to Squire Cassidy and others that she had advanced these moneys to her husband for the purpose of buying the labor claims. In point of fact the proof shows that a part of the money which she advanced went directly to persons who had sold Mr. Folwell some of these labor claims and taken his simple note for their price, and with regard to the balance that it went to pay his debts to the banks for money previously borrowed for the purpose of buying such claims. It thus appears that if she intended to be understood as saying that she advanced the money to Mr. Folwell to buy labor claims, it was simply a misdescription by her of the transaction. In substance her statement was true.

The complainant relies upon certain declarations made by Thomas G. Folwell some time before the date of the conveyance of 1880, to show that he made that conveyance for the express purpose of preventing the enforcement of the Methodist church decree, should one be obtained against him.

It is a well-settled rule that if a transaction of this character is capable of two constructions, one that comports with honesty and one with dishonesty, the former should be adopted by the court, and I think that the rule is especially applicable to a transaction so old as the one here attacked. Bearing that in mind, I think that all those declarations, even if they had been concurrent with the conveyance, may be easily reconciled with an honest purpose, on the ground that they amounted to no more than a declaration that in case he was unable to pay all his debts—the Methodist church decree and his other debts—he

preferred to pay the other debts, which the proofs show were actually paid by Mrs. Folwell's checks. All of those preferred debts were, in one sense, debts of honor, because those that were not secured by endorsements were incurred under circumstances that made it peculiarly his duty to pay them, and those that were secured by endorsements put him in the same position towards the endorsers.

I think his conduct in devoting his property to the payment of those debts was perfectly justifiable. At that time no doubt it was problematical whether he would ever receive anything on account of the debt certificates which he had purchased on speculation, so that I am unwilling at this length of time to convict him of any actual fraudulent intent in that transaction.

But granting that he did intend to defeat the Methodist church debt, that intention must be brought home to the defendant Susan Folwell. The complainant attempts to accomplish this by proving a conversation that occurred with Folwell in his house, in the presence of his wife, some time before the transaction. There is no satisfactory evidence that she fully understood this conversation if she heard it accurately, but only that she might have done so. She denies all knowledge of anything of the kind, and the whole conversation may have passed from her mind before the conveyance was made.

But grant that she did have notice of the particular fraudulent intent to defeat the Methodist church, still I am of the opinion that the payment of upwards of $6,000, shown to have been made at the date of the transaction directly to the extinction of the honest debts of Mr. Folwell, is sufficient of itself to protect her to the extent of such payment. I so held in the recent case of *Joseph M. Smith & Co.* v. *O'Brien and Boisaubin,* *12 Dick. Ch. Rep. 365.*

The case here made differs from those (of which *Green* v. *Tantum,* *4 C. E. Gr. 105,* is the leader) where full value in cash is paid for property conveyed to the grantee with the knowledge that the grantor intends to make such disposition of the proceeds of the sale as to put them beyond the reach of his credit-

ors. Here the money was devoted to the payment of honest debts, and to that extent the conveyance must be upheld.

But I am not satisfied that the defendant Susan had any notice whatever of any fraudulent intent on her husband's part. She denies it positively, and the concurrent conduct of the parties shows a complete absence of any fraudulent intent, because the money presently paid at the time of the transfer went, as I have said, to the payment of honest debts.

The subsequent payment by Mrs. Folwell directly to her husband of between $5,000 and $6,000 does not appear to have been made as a part of a fraudulent scheme to defraud creditors, present or future. Folwell's prompt payment of the church decree when it came against him tends strongly to show that his object in the start was simply to secure his favored creditors in case he could not pay all. When it appeared that he was able to pay all he did so promptly.

And it is to be observed that the case as presented is entirely free from any appearance of a fraudlent scheme concocted to put a man's property out of his hands, with the view of presently obtaining credit and running in debt in hazardous business transactions, and thereby preserving his property from the risk of such transactions. It is in favor of persons who have become creditors under such or similar circumstances that the rule that a conveyance may be fraudulent as to future creditors is to be invoked. The subject is discussed in *Beeckman* v. *Montgomery, 1 McCart. 106* (at *pp. 111, 112*). On the latter page Chancellor Green remarks: "The deed was made on the eve of the grantor engaging in mercantile business, which would require for its successful pursuit both capital and credit." And see, further, what was said by Master Wilson in *Cramer* v. *Reford, 2 C. E. Gr. 367* (at *pp. 381, 382*).

I can find no authority for the position that where a conveyance is made for the purpose of hindering a single creditor, who is afterwards paid in full, and there were no other concurrent creditors who might have been hindered or delayed, and there was no immediate intention of engaging in hazardous business

and becoming indebted, a creditor who becomes so years after-wards can set up the old fraud in avoidance of the conveyance.

It was urged that the fact that Mrs. Folwell turned over to her husband substantially all the proceeds of the debt certifi-cates, as fast or faster than she received them, is a mark of fraud, and that she is therefore to be charged with them. The fair inference is that, at the time the conveyances of January and February, 1880, were made, the value of the debt certificates was entirely speculative, and they were thrown in merely as ad-ditional security. The only thing which she received, that she knew at that time to be of certain value, was the life interest in the Camden houses, and the Camden bonds, amounting, as we have seen, to about $4,000. . For this she paid down over $6,000 to her husband's creditors. She was entitled to retain out of the proceeds of the debt certificates over $2,000 to make up for the deficiency in value of the other assets as compared with the amount that she paid on his debts, and if she intended simply to be paid the value of what she purchased, she had no right to retain the balance of the debt certificates. In point of fact, how-ever, she paid them all to her husband. But, as I infer from the whole transaction that they were received merely as addi-tional security, I can see no fraud in her turning over the pro-ceeds to him. Such payment harmed nobody, and manifested honesty rather than dishonesty.

It is further urged that, by the strict terms of the direct con-veyance of January 20th, 1880, made by her husband to her, his interest in the Bingham estate was included, as it must have passed to him by a clause in his father's will which is exhibited in evidence. At that time, as has been observed, it was unknown that the Bingham estate would prove of any value. In fact, his title to it was perfected afterwards. But be that as it may, in law the conveyance directly to the wife was quite futile. It was prepared by Folwell himself, executed and put upon record before any money was paid, and, when the contemplated trans-action came to be carried out, the defect in the conveyance was discovered, and an effectual conveyance was made through Mr. Harned, in which only the Camden houses and lots are men-

tioned, and a reading of the description contained in the deed shows that the parties had in mind only the Camden lots. That deed of January 20th does not appear to have ever been recorded in Pennsylvania or any use of it made there. This shows that it was not intended as a cover of the Pennsylvania property. If such had been the intention, it would have been recorded there, and if the whole transaction was intended to put all of Folwell's property out of his hands, then when the formal conveyance was made through Harned the Pennsylvania property would have been mentioned and the deeds have been recorded in Pennsylvania as well as in New Jersey. In fact, the Harned deeds never were recorded, but Mrs. Folwell took immediate possession of the Camden houses through Squire Cassidy, the agent who had them in charge. He swears that, by direction of Mr. Folwell, he paid to her the rents from that time on. So far, then, as these conveyances go, they left the Pennsylvania property open and free to Mr. Folwell's creditors, and the complainant herein is at liberty to proceed against that property in the proper forum.

It is further said that her husband continued to use the premises as his own, with her consent. They consist of fourteen very small, old and dilapidated tenement-houses, which rent from $5 to $8 a month each, and were in the hands of Squire Cassidy as agent to let and collect the rents. He swears that he recognized Mrs. Folwell as the owner and accounted to her therefor from 1880. But it does appear that on one or more occasions Mr. Folwell intervened and managed to collect some of the rents, and that his wife complained of it.

Several letters written by Mrs. Folwell to Cassidy were exhibited in support of the allegation that Folwell continued in control. In one of those letters, dated June 11th, 1888, she writes to Squire Cassidy about one tenant who claimed to have made a payment. She says: "I do not doubt he paid it, and Mr. Folwell used it. He is in the habit of doing so if he can. I want you to take charge of the houses."

In another letter, dated June 24th, 1888, she writes:

"In regard to Schedeker, I will stand by you, and want him either to pay the rent to you or move out, whichever suits him best. I do not think Mr. Folwell will bother about it."

Another, dated six days before—June 18th—in which she writes about the amount due from Schedeker, and says:

"Mr. Folwell says he received $60 in the winter and kept it. I have had $72 rent and $22 just paid. Please take care of the houses and collect the rent, *and please do not pay the bills unless very small, for then it comes off of my income, otherwise I can get Mr. Folwell to pay; as the rents are security for debt, I should not pay expenses.* Please let me know if you receive this."

The indication from that letter is that she held the property as security for money loaned, and the others indicate that Mr. Folwell had been in the habit of collecting some of the rents and giving an oversight to the property. I see nothing in them to show that Mrs. Folwell did not claim to have title of some kind to the premises. The one letter shows it to be that of a mortgagee, and Squire Cassidy swears that she so stated to him in conversation.

The utmost that the correspondence shows in complainant's favor is to give him the right to redeem and a right to an account between Folwell and his wife as to the rents of the property. The complainant does not ask that remedy. The case was not put upon that ground.

Still, I think that if complainant desires he is entitled to redeem on paying Mrs. Folwell what is still due to her from her husband, and may have an inquiry by a master and an account to ascertain that amount. But in taking the account the master should be directed to allow Mrs. Folwell for all payments which she has made to or on behalf of her husband up to the time of the filing of this bill, charging her of course with the net rents and profits of the premises and any cash which she may have received from her husband on account of the indebtedness from him to her.

Unless the complainant shall take such a decree within twenty days after being served with request to do so, the bill will be dismissed.